

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONDA HAMILTON, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case. No. 11 C 6471 |
| v. | ) | |
| | ) | Magistrate Judge |
| Michael J. Astrue, | ) | Arlander Keys |
| Commissioner of Social | ) | |
| Security | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Claimant, Ronda Hamilton ("Ms. Hamilton" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and denying her claim for Social Security Benefits under Title II of the Social Security Act, 42 U.S.C. §§416 and 423. This case is before the Court on cross-motions for summary judgment. Ms. Hamilton raises several issues for review, including: 1) whether this Court should reverse the decision of the administrative law judge ("ALJ") because the Claimant turned age 50 during the pendency of her request for review, thereby becoming a person of advanced age and possibly entitled to benefits, 2) whether the ALJ improperly analyzed Claimant's credibility, 3) whether the ALJ failed to give controlling weight to the opinion of Claimant's treating physicians, and 4) whether the ALJ failed to consider the entire record. For the reasons set forth below, Claimant's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.

BACKGROUND FACTS

PRE-DECISION PROCEDURAL HISTORY

On April 21, 2006, Ms. Hamilton filed a Title II application for disability benefits, claiming she became disabled in an auto accident that occurred on December 25, 2005, and has been unable to work as of that date. The claim was initially denied on June 19, 2006, and again upon reconsideration on September 27, 2006. Thereafter, Ms. Hamilton filed a timely request for a hearing, which was conducted on January 11, 2008. ALJ Joel G. Fina issued a decision on April 4, 2008, finding Ms. Hamilton not disabled under sections 216(I) and 223(d) of the Social Security Act. Ms. Hamilton appealed. On September 23, 2008, the Appeals Council granted her request for review, vacated the hearing decision, and remanded for further action, finding that the ALJ erred in assessing Ms. Hamilton's credibility and that additional records should be considered prior to final adjudication of the case. The second hearing took place October 15, 2009. On November 23, 2009, ALJ Denise McDuffie Martin decided unfavorably.

POST-DECISION PROCEDURAL HISTORY

Ms. Hamilton appealed ALJ Martin's decision. While her request for review was pending, on December 22, 2010, she turned 50 years old. Ms. Hamilton filed a new claim on June 10, 2011. The Appeals Council denied review of the case. Thus, the ALJ's decision became the final decision of the Commissioner. Ms.

Hamilton then filed this current lawsuit on September 15, 2011, seeking a review of the decision. The parties consented to the case being tried before a United States Magistrate Judge, and the case was assigned to the Court on December 1, 2011. Thereafter, cross-motions for summary judgment were filed.

HEARING TESTIMONY

### I. Claimant's Hearing Testimony

Ms. Hamilton, age forty-eight at the time of the second hearing, appeared personally and was represented by counsel. Ms. Hamilton testified to the following: she was in an auto accident on December 25, 2005, wherein her L1 vertebra was fractured and broken. [R. 56] There was damage to the left, non-dominant rotator cuff, and a bicep muscle was torn, as well. [R. 56-57] She spent four days in the hospital, returning home in a body brace. She required the use of a body brace, a shower chair, and other medical devices. [R. 57] She was prescribed pain medicine, muscle relaxers, and anti-inflammatories. [R. 57] She required someone with her at all times. [R. 57] She did not have any operations on her back. [R. 57] She experienced numbness mostly in her left leg when she is up or walking for a while, and at times tingling in her feet. [R. 57] Sometimes she wakes up and feels as if "I'm walking on rocks," her feet tingle and her left knee hurts down to her foot. [R. 57] Her right leg is weak. [R. 57] She can lift her left leg better than her right. [R. 58] Internal muscle release therapy improved her

bladder spasms, but they still occasionally occur. [R. 58] A chiropractor regularly stretches and adjusts her. [R. 58] She has had 11 epidural injections, all of which did not work, and she also discovered that she is allergic to them. [R. 58]

Prior to the accident, she worked as a nursing assistant for 23 or 24 years. [R. 58] The lifting, bending, stooping, reaching, pushing, sitting and walking prohibits her from doing that job any longer. [R. 58] She can lift about 12 to 15 pounds. [R. 59] Her problem with bending is getting back up, and when she stoops, she needs to hold onto something to get back up. [R. 59] Reaching causes a muscle spasm and hurts the left side of her back. The inability to push limits her shopping. [R. 59] If she sits too long, her left side and back tighten and sometimes feel cold, while her bladder and rectum spasm, as well. [R. 59] She is only able to rid herself of the pain and spasms by lying down or reclining "straight out" in her lazy boy chair. [R. 59-60] The pain occurs after 20 minutes of sitting, "and that's pushing it." [R. 60] She still experiences pain if she changes position. [R. 60] She must avoid getting to this point, otherwise it is really bad for her. [R. 60]

She can walk a mile. [R. 60] When she goes shopping, the pain begins after about an hour and a quarter to an hour and a half of standing, stopping, and standing. [R. 60] By that point, it also hurts to sit down. [R. 60-61] To alleviate the

4

pain, she must lie down for at least half an hour to forty-five minutes. She lies down every day, four or five times a day, for 20 to 30 minutes after various activities. [R. 61] She finds it harder to sit than to stand. [R. 61-62] She must take breaks while doing house chores. [R. 63] Her husband helps with the laundry and cooking. [R. 63-64] She watches tv from her recliner, with legs elevated. Although her doctors have advised it, she has not had any surgery because of her fear of the pain, the medication, and the need to be totally dependent on someone else. [R. 64] She would prefer to wait until the point where she must be carried out of the house before submitting to surgery. [R. 64-65]

Her last bladder spasm was in August. (At this point in the hearing, Ms. Hamilton had to stand.) [R. 66] Some days she wakes up out of her sleep in spasms and must take a muscle relaxer, sit on the couch, and/or use a heating pad. [R. 68] With 10 being the worst, her back pain is at an 8 or 9. She takes Flexeril and Advil. She was prescribed stronger medications such as Lyrica, but finds that they do not agree with her, and make her feel "goofy". Lyrica, specifically, made her feel drunk. Darvocet and Oxycontin made her sick and gave her hallucinations. She was incoherent and did not remember conversations. [R. 68] She has difficulty concentrating when the pain is bad. [R. 68-69] This intense pain occurs at least

once a week and can take up to four days to get to a more manageable level of pain. [R. 69] She could not sit long enough to work as a receptionist. The prolonged sitting and leaning that is necessary to use a keyboard is prohibitive, filing and leaning back and forth to answer the phone would not work either. [R. 69-70]

She did not complete high school, nor receive a GED. [R. 70] She is married with no children. [R. 67] She attends Bible study on Thursdays and volunteers at a food pantry on Tuesdays. [R. 66] She does not visit with friends often. Sitting through 45 to 60 minutes of church is difficult, and she must either squirm or stand up in the back. [R. 67] She can not sit long enough to go to the theater or to watch a movie. [R. 70] She smokes half a pack to a pack of cigarettes a day, drives a short distance just about everyday, and is unable to really socialize due to the sitting that socializing involves. [R. 70]

## II. Medical Expert's Hearing Testimony

Dr. Sheldon J. Slodki, a physician specializing in internal medicine, testified as the Medical Expert ("ME") to the following: Ms. Hamilton sustained a L1 compression fracture in a motor vehicle accident. [R. 71] She had surgery on August 29, 2006 for her rotator cuff and biceps tendon. She experiences complex pain syndrome, pelvic floor pain, dyspareunia (pain during sexual intercourse), and bladder spasms. [R. 71] He

agrees with several of the RFCs in the record finding Ms. Hamilton limited to sedentary work. [R. 72] His general impression of Ms. Hamilton's evaluations are that she is sedentary. [R. 79] The reaching restrictions imposed by Drs. Luken and Dugan pertained to Ms. Hamilton's lower back, rather than to her shoulder. [R. 79-80] At this point, Ms. Hamilton interjected with additional testimony that indeed her left shoulder was implicated when reaching. Dr. Slodki agreed and helped her to explain that although she is right-hand dominant, her left arm goes into convulsions when trying to reach overhead for heavy objects. [R. 81-82, 374-378, 443-446, 470-489]

### III. Vocational Expert's Hearing Testimony

Lastly, Cheryl Hoiseth, an Illinois licensed clinical professional counselor, testified at the hearing as the Vocational Expert ("VE"). The VE testified that the record indicated that Ms. Hamilton's previous work as a certified nursing assistant was done at the heavy exertional level, and that the Dictionary of Occupational Titles put it at a medium rating that is "semiskilled with an SVP: 4." [R. 82-83] The ALJ then posed a hypothetical, involving: an individual the Claimant's age, education, and work experience who would be limited to sedentary level work, no climbing of ladders, ropes or scaffolds, no overhead reaching with the left upper extremity, occasional climbing of ramps and stairs with occasional

7

balancing, stooping, kneeling, crouching and crawling. [R. 83]
The ALJ then asked the VE whether that hypothetical person would
be capable of doing the Claimant's past work, to which, the VE
responded no. [R. 83]

However, the VE explained that there would be other jobs in
the national economy that would accommodate such limitations; 3,
600 other jobs to be exact, including that of an information
clerk, order clerk, and general office clerk. [R. 83] The VE
explained that Ms. Hamilton would have zero transferable skills
to any sedentary work, however. [Id.]

Finally, the VE testified that, if Ms. Hamilton needed to
alternate between sitting and standing every 30 minutes, all work
would be precluded. [R. 83-84] However, a limited range of
sedentary work, together with a need to alternate between sitting
and standing every 45 minutes, would not preclude work. [R. 84]
On cross examination, the VE testified that someone who could sit
only 20 minutes and then needed a standing break of up to 60
minutes would be precluded from work. [R. 84-85] Additionally,
a person who could lift less than ten pounds and stand and/or
walk less than 2 hours of 8 would be precluded from work, as
well. [R. 86]

## IV. MEDICAL EVIDENCE

In addition to the testimony of Ms. Hamilton, the ME, and the VE, the ALJ also considered Ms. Hamilton's relevant medical records from her treating physicians.

### DR. SHEILA DUGAN

Dr. Dugan, a pain management specialist, was of the opinion after evaluating Ms. Hamilton on September 15, 2007 and again on April 28, 2008, that Ms. Hamilton had persistent chronic daily pain. [R.655] She noted that Ms. Hamilton can sit for about two hours when she is on a soft surface, but only for about 20 to 30 minutes on a stiff chair. [R. 655] Dr. Dugan recorded that Ms. Hamilton experiences ongoing pain when walking in both her lumbar spine and the bottom of her feet, and although it has slightly improved with physical therapy, she continues to suffer from overactive bladder symptoms. [R. 655]

On May 12, 2008, Dr. Dugan noted on a Medical Sources Statement that Ms. Hamilton could only lift less than 10 pounds, stand and/or walk less than 2 hours out of an 8-hour workday, sit less than 6 hours out of an 8-hour workday, and also needed periodically to sit and stand to relieve pain. [R. 617-8] Dr. Dugan recommended continued use of Lyrica as well as physical therapy. [R. 655]

DR. MARTIN G. LUKEN III

Ms. Hamilton saw Dr. Luken, a neurologist, for evaluation of her low back pain in October 2006 at the Chicago Institute of Neurosurgery and Neuroresearch ("CINN"). [R. 491-492] Dr. Luken found Ms. Hamilton to have a palpable step-off and distinct tenderness over the dorsal spinous processes at the thoracolumbar junction. [R.491] Dr. Luken indicated that injection treatments as well as thoracolumbar stabilization surgery might be a possibility should Ms. Hamilton's symptoms persist. Ms. Hamilton continued to be treated regularly and frequently with the physicians at CINN throughout 2007. [R. 491-492, 494-527, 534-597] Dr. Luken noted in a 2007 letter that he was seeing Ms. Hamilton "for a complex pain syndrome related to a severe lumbar vertebral compression fracture." [R. 647] He recorded that, in his opinion, Ms. Hamilton "should regard herself as completely disabled from the standpoint of gainful employment..." [R. 647]

In April 2009, Dr. Luken signed his name to a Medical Sources Statement of Ability to do Work-Related Activities, but noted that he had not personally seen Ms. Hamilton since August of 2007 and did not know of her current status. [R. 660] Instead, Renee Spanburg, PT CEASII, conducted the performance screen, and was of the opinion that Ms. Hamilton could: frequently lift or carry less than 10 pounds, stand and/or walk 2 hours out of an 8-hour workday, must periodically alternate

between sitting and standing to alleviate pain, and that her maximum sitting tolerance before needing a standing break was 20 minutes. [R. 658-660] However, Ms. Spanburg noted that Ms. Hamilton stood for 60 minutes with no objective difficulty or request for a rest break.

### Dr. Jeffrey Tioco

On February 1, 2006 and again on March 29, 2006, Dr. Tioco, of the Orthopaedic Associates of Munster, saw Ms. Hamilton for evaluation of her increased shoulder pain since the accident. [R.374-378] He assessed her as having left rotator cuff tendinitis and a left acromioclavicular joint sprain. He scheduled Ms. Hamilton for physical therapy, including left rotator cuff strengthening exercise and modalities. Upon reevaluation, Dr. Tioco noted that Ms. Hamilton was unable to do any weight training due to her back problems, and that any weight bearing on the left upper extremity was difficult. [R. 376] Dr. Tioco noted that if Ms. Hamilton's symptoms continue, he would consider ordering an MRI of the left shoulder with gardolinium arthrogram during her next visit. [R. 378]

In May and August of 2006, Ms. Hamilton continued to complain to Dr. Tioco of significant left shoulder pain and decreased functional ability. [R. 472-478] On August 7, 2006, Ms. Hamilton was evaluated for a rotator cuff tear and left frozen shoulder (adhesive capulitis) and underwent left shoulder

arthroscopy as well as rotator cuff repair and debridement on August 9, 2006. Dr. Tioco reevaluated Ms. Hamilton on September 13, 2006; he transitioned her to a sling and continued her on aggressive physical therapy. [Id.]

### Additional Medical Records

An MRI of Ms. Hamilton's lumbar spine was taken on May 10, 2006. [R. 382] It revealed that, at L1, Ms. Hamilton had a compression deformity that touched on the spinal cord, and it showed cysts in the left neural foramen at T10-11, T11-12, and T12-L1. [R. 382] A second MRI of Ms. Hamilton's lumbar spine was taken on February 27, 2007, showing spinal stenosis at L1, bilateral neural foraminal stenosis at L5-S1, a small lesion in the left neural foramen at T12-L1, and lesions in the sacral canal. [R. 581-2] There was evidence of chronic thoracolumbar instability, pain, radiculopathy, abdominal pain, and pubic symphysitis. [R. 602] The record reflected degenerative disc disease at L4-L5 and at the L5-S1 joint space. [R. 583, 586] Finally, evidence was found of bladder spasms, pelvic floor dysfunction, dyspareunia (pain during sex), physical therapy and a series of epidural injections. [R. 609-611]

V. THE ALJ'S DECISION

The ALJ issued her decision on November 23, 2009, finding that Ms. Hamilton was not disabled within the meaning of the Social Security Act under sections 216(I) and 223(d). [R. 47] The ALJ applied the five-step sequential analysis as required by the Act, under 20 C.F.R. 404.1520(a).

At step one, the ALJ determined that Ms. Hamilton had not engaged in substantial gainful activity since December 25, 2005 (the alleged onset date). [R. 35]

At step two, the ALJ determined that Ms. Hamilton had a couple of severe impairments: low back pain secondary to vertebral fracture and left shoulder rotator cuff injury, status post arthroscopy. [R. 36] The ALJ pointed out that these impairments caused more than minimal functional limitation in Ms. Hamilton's ability to perform basic work activity. [R. 36]

At step three, the ALJ concluded that Ms. Hamilton did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments from 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). [R. 36] The ALJ explained that, although Ms. Hamilton has "severe" impairments, considered singly or in combination, they still do not meet the criteria of any of the Listings. [R. 36]

At step four, the ALJ concluded that Ms. Hamilton's residual functional capacity would allow her to perform sedentary work as defined in 20 C.F.R. 404.1567(a). [R. 36] The ALJ found that Ms. Hamilton required a sit/stand option, allowing her to sit or stand alternatively at will every 45 to 60 minutes. The ALJ believed Ms. Hamilton capable of occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs, but incapable of using her left upper extremity for overhead reaching. The ALJ concluded that Ms. Hamilton should not climb ladders, ropes, or scaffolds. In making her decision, the ALJ noted that she considered all of her symptoms and the extent to which the symptoms could reasonably be accepted as consistent with objective medical advice and other evidence as required under 20 C.F.R. 404.1529 and SSR's 96-4p and 96-7p. [R. 36] Additionally, the ALJ considered opinion evidence in accordance with 20 C.F.R. 404.1527 and SSR's 96-2p, 96-5p, 96-6p, and 96-3p. [R. 36] Next, the ALJ briefly summarized the testimony of Ms. Hamilton and stated:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. [R. 37]

The ALJ then summarized all of Ms. Hamilton's medical records.

14

[R. 37-45]   After this review, the ALJ stated:

> ...I do not find support for the claimant's subjective allegations as to the disabling nature of her impairments to the extent that they are inconsistent with the residual functional capacity assessed herein. Consequently, I find that there is no basis to conclude that the claimant suffers from debilitating pain or other symptoms that would further reduce her residual functional capacity. [R. 45-46]

The ALJ concluded by finding that Ms. Hamilton retained the residual functional capacity to perform a restricted range of sedentary work. [R. 46]

At step five, after considering the testimony of the VE and the limits of her residual functional capacity, the ALJ determined that Ms. Hamilton was unable to perform any past relevant work, under 20 C.F.R. 404.1565. [R. 46]   However, the ALJ found that transferability of job skills was not material to the determination of disability because the use of the Medical-Vocational Rules (SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2) supported a finding that Ms. Hamilton was not disabled, whether or not the claimant had transferable job skills. [R. 46]

Finally, the ALJ reviewed the testimony of the VE and found there to be a significant number of jobs that existed in the national economy that Ms. Hamilton could successfully adjust to given her age, education, work experience, and residual functional capacity under 20 C.F.R. 404.1569 and 20 C.F.R.

404.1569(a). [R. 46-47] She qualified for 2,900 information clerk jobs, 900 order clerk jobs, and 3,600 general office clerk jobs. [Id.] Thus, the ALJ found Ms. Hamilton not disabled and not entitled to benefits. [R. 47]

## STANDARD OF DISABILITY ADJUDICATION

In order to be entitled to benefits under the Social Security Act, a claimant must be evaluated under a five-step inquiry and found to be "disabled." 20 C.F.R. § 404.1520. Step one requires the ALJ to determine whether the claimant is employed. Under step two, the ALJ must determine whether the claimant has a severe impairment as defined by the Social Security Administration. At step three, the ALJ determines whether the impairment meets or is medically equal to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. During step four, the ALJ evaluates the claimant's "Residual Functional Capacity" ("RFC") and determines whether they can perform their past relevant work. Finally, during step five, the ALJ determines whether the claimant has the ability to perform any other work that exists in the national economy.

## STANDARD OF REVIEW

When addressing an appeal of an ALJ's decision, a district court must affirm the decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). When determining

whether the evidence is substantial, it must be "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 401 (1971). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* When reviewing the ALJ's decision for substantial evidence, the court cannot "displace the ALJ's judgment by reconsidering facts or evidence or making [a] credibility determination." *Skinner v. Astrue,* 478 F.3d 835 (7th Cir. 2007). Should there be conflicting evidence that leads reasonable minds to differ in opinion, it is solely the ALJ's responsibility to determine whether the claimant is disabled, not the district court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Even though an ALJ is not required to address every piece of evidence in the record, she must furnish her analysis through building a logical and accurate bridge between the evidence and her conclusions, thus allowing a reviewing court to conduct a meaningful review of the ultimate findings of the Social Security Administration. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). A court must affirm the ALJ's decision if there is substantial evidence supporting her decision, unless the ALJ does not articulate the grounds for her decision in such a way that allows a meaningful review. *Sims*, 309 F.3d at 429.

## ANALYSIS

Ms. Hamilton raises several objections to the ALJ's decision; the Court will discuss each in turn. Claimant argues that: 1) the Court should reverse the decision of the ALJ because during the pendency of her request for review, Ms. Hamilton turned 50, becoming a person of advanced age and entitled to benefits, 2) the ALJ improperly analyzed Claimant's credibility, 3) the ALJ failed to give controlling weight to the opinion of Claimant's treating physicians, and 4) the ALJ failed to consider the entire record.

### A. THE COURT HAS NO JURISDICTION TO REVERSE THE ALJ'S DECISION BASED ON CIRCUMSTANCES OCCURRING AFTER THE HEARING.

Ms. Hamilton's main contention is that regardless of the other issues, she is entitled to an immediate award of benefits as of December 22, 2010, when she turned 50 years old. [Pl.'s Br. 8-11] At the time of the ALJ's decision, Claimant, a 48 year-old woman, was considered a younger person with no transferable skills, limited to a reduced range of sedentary work. 20 C.F.R. § 404.1563 [R. 36] However, while her request for review was pending, she turned 50 years old, moving her into the category of a person closely approaching advanced age. Ms. Hamilton correctly notes that SSA's Medical-Vocational Guidelines (the"Grids") direct a finding of "disabled" for a 50-year -old with no transferable skills who is limited to sedentary work. [Pl.'s Br. at 9] Ms. Hamilton filed a subsequent application

18

because of her new age category on June 10, 2011. The Appeals Council denied review of the November 23, 2009 decision, and Ms. Hamilton has yet to obtain a final decision from the Commissioner on her second application.

Ms. Hamilton argues that, even if the ALJ's findings regarding her RFC and credibility are correct, she should be reversed due to her subsequent change in age. Ms. Hamilton opines that, because she turned 50 while her request for review was pending before the Appeals Council, the Appeals Council should have granted her benefits. Ms. Hamilton relies on a Fourth Circuit case, *Lively v. Sec'y of Health & Human Svcs.*, 820 F.2d 1391 (4th Cir. 1987). The claimant in *Lively* applied for disability benefits and was denied at the age of 54. 820 F.2d at 1391-92. The ALJ found that he was capable of light work only. *Id.* at 1391. Several weeks after the ALJ's unfavorable decision, the claimant turned 55 years old, and he filed a second application for benefits two years later. *Id.* at 1392. The second application also resulted in a finding that the claimant was not disabled, but the new ALJ found the claimant not disabled because he could perform medium work. *Id.*

On appeal, the issue was whether the principles of *res judicata* applied, making the functional capacity determination of light work in the first decision binding on the second. *Id.* The Fourth Circuit found that *res judicata* did apply and concluded it "utterly inconceivable that [Lively's] condition had so improved

in two weeks as to enable him to perform medium work. *Id.* at 1392.

Although factually similar, the case is distinguishable in two important ways. First, the claimant in *Lively* turned 55 years old in a very short time after the initial application was denied – two weeks *Id.* at 1392. Second, the claimant upon turning 55, filed a second application for disability benefits and obtained a second final decision from the Commissioner prior to arguing that he was entitled to benefits based on his new age category. *Id.* at 1391. Ms. Hamilton, however, turned 50 in December of 2010, over a year after the October 15, 2009 hearing took place. Thus, not making it inconceivable that her condition could have improved somewhat. Furthermore, although Ms. Hamilton filed a second application for benefits, a final decision has not been obtained from the Commissioner on her subsequent claim.

As Defendant points out, the instant case is more similar to *Latkowski v. Barnhart*, 93 Fed. Appx. 963 (7th Cir. 2004) than to *Lively*. Like *Lively*, Ms. Latkowski also changed age categories soon after the ALJ issued an unfavorable decision, and while her request for review was pending with the Appeals Council. However Ms. Latkowski, like Ms. Hamilton, did not obtain a second final decision from the Commissioner prior to arguing that she was entitled to benefits based on her new age category, and the Seventh Circuit ruled that it could not grant the relief sought due to their being "no successive cause of action." *Latkowski*, 93

Fed. Appx. at 975. Claimant seeks to distinguish herself from Ms. Latkowski by asserting that, whereas Ms. Latkowski never filed a second claim, she did. [Pl.'s Response at 2-3] Thus, Claimant argues, she has the necessary successive claim to which *res judicata* and the principle of *Lively* should apply. However, Claimant's argument is misplaced, as the crux of the issue is not the *filing* of the successive *claim* but the *obtainment* of a successive *decision*.

The Seventh Circuit ruled that it could not grant Ms. Latkowski the relief she sought because there was "no successive cause of action to which *res judicata* and the principle of *Lively* could apply and no official claim for this court to consider." *Latkowski*, 93 Fed. Appx. at 975. Ms. Hamilton filed a subsequent application in June 2011 but has not obtained a final decision from the Commissioner on this second application. Consequently, she has not exhausted her administrative remedies as 42 U.S.C. § 405(g) requires, *Califano v. Sanders*, 430 U.S. 99, 102, 108(1977); *Weinberger v. Salfi*, 422 U.S. 749, 767 (1975), and lacks the requisite successive official claim for this court to consider. As a result, the only relevant age at issue in this case for this court is Ms. Hamilton's age at the time the ALJ issued her decision - 48. Morever, 48 is the only age relevant to the Appeals Council as well, as although Ms. Hamilton turned 50 while her claim was in front of them, the Seventh Circuit has ruled that when the Appeals Council has denied review, evidence

submitted for the first time to the Council, although part of the record, cannot be considered in determining the correctness of the ALJ's decision. *Diaz v. Chater*, 55 F.3d 300, 305 n. 1 (7th Cir.1995).

Unfortunately, this Court's jurisdiction lies in 42 U.S.C. § 405(g), which allows a district court to review the final decision of the Secretary. When the Appeals Council denies review of the case, the decision of the ALJ is the final decision of the Secretary. Thus, the Court has only the power to review the decision of the ALJ under the substantial evidence standard. 42 U.S.C. 405(g). The Court finds that it does not have jurisdiction to reverse or remand the case back to the ALJ based on facts not in evidence at the time she made her decision.

## B. **THE ALJ APPROPRIATELY EVALUATED CLAIMANT'S CREDIBILITY**

Ms. Hamilton next argues that her case ultimately turned on how long she could sit at work before needing a break, and that the ALJ cherry-picked evidence that falsely portrayed a duration longer than what she could actually sustain. [Pl.'s Br. 11-12] Ms. Hamilton specifically challenged the ALJ's finding that she required a sit/stand option that let her change positions at will every 45-60 minutes [R. 36]. Ms. Hamilton maintains that the ALJ should have believed her when she said she could only sit for 20 minutes in an average, stiff-backed chair without becoming uncomfortable. An ALJ may properly find that inconsistencies between a claimant's testimony regarding her limitations,

compared with other evidence in the record, may detract from her credibility. *See, e.g., Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Ms. Hamilton contends that the ALJ created a false inconsistency by misreading her testimony from the first of her two administrative hearings, thus reaching an unfavorable decision that was not based on substantial evidence from the record. The Court agrees that the ALJ's summation of Ms. Hamilton's testimony regarding her ability to sit during her first hearing is misleading, but disagrees with her conclusion that it reaches the level of error warranting reversal.

Ms. Hamilton testified to her ability to sit at her January 11, 2008 hearing as follows:

> Q: How long can you sit before you become uncomfortable and have to get up?
> A: Well it depends on what kind of chair I'm sitting in. So if I'm sitting in a straight back chair it's about 15 to 20 minutes, if I'm in a lazy boy or something that really supports my back I can sit for maybe an hour, hour and half.
> [R. 103-104]

Ms. Hamilton testified at her October 15, 2009 hearing that she could sit "[t]wenty minutes, and that's pushing it." [R. 60] In her decision, the ALJ wrote that "[a]t the January 11, 2008 hearing, [Ms. Hamilton] testified that she was able to...sit for 15 minutes to one hour... ." [R. 37] The ALJ then wrote that "[a]t the October, 15, 2009, hearing, [Ms. Hamilton] testified…that she was capable of sitting for 20 minutes…." [R. 37] The Court acknowledges that the way in which the ALJ noted

that part of Ms. Hamilton's testimony, failing to mention that
Ms. Hamilton specified that in a La-Z-Boy like chair she could
sit about an hour to a hour and a half, but in a regular chair
she could only sit up to about 15 to 20 minutes, is misleading.
However, the Court does not find that is reaches a level of error
that requires reversal.

Moreover, the ALJ provided substantial evidence of
additional testimony and records supporting her finding that Ms.
Hamilton could sit longer than her testimony portrayed.  The ALJ
noted that a report from Ms. Hamilton's physical therapist also
included a 20-minute limit on sitting, but that notes from Ms.
Hamilton's treating physiatrist, Dr. Sheila Dugan, indicated that
Ms. Hamilton "can sit for about two hours when she is on a soft
surface, but only for about 20 to 30 minutes on a stiff chair"
[R. 41]  Dr. Dugan, as the ALJ correctly observed, submitted an
opinion that Ms. Hamilton could sit for less than six hours in a
typical work day, and needed to change positions periodically,
but did not specify how often she needed to change positions.
[R. 42]

The ALJ also found support for her evaluation of Ms.
Hamilton's ability to sit in Ms. Hamilton's January 2008 hearing
testimony that she made a trip by car to Kentucky that lasted 10-
12 hours, during which Ms. Hamilton did all the driving, did not
stop overnight, and stopped to rest "just every couple hours" [R.
45, *citing* R. 101-02]  While, Ms. Hamilton makes a strong

argument that car seats are more comfortable than desk seats, and that such a commute is a rarity, the fact remains that there is evidence that she was able to sit longer than the maximum of 1 hour and a half in a comfortable seat that she testified to if she was able to drive to Kentucky and only stop to rest "every couple hours." Dr. Dugan's opinion and treatment notes, Ms. Hamilton's testimony, and the evidence regarding the trip to Kentucky constitute substantial evidence supporting the ALJ's reasonable conclusion that Ms. Hamilton could perform sedentary work as long as she could change positions at will every 45-60 minutes.

Finally, Ms. Hamilton claims that in evaluating her credibility, the ALJ held it against her that she failed to pursue additional treatment. [Pl.'s Br. 12] She fails to provide a cite as to where in the decision this bias is found, and the Court finds no such evidence either.

Social Security Regulations require an ALJ to support her credibility finding with reasons that are supported by the evidence in the administrative record, and are sufficiently specific to make clear how the ALJ weighed the evidence. Social Security Ruling ("SSR") 96-7p(5), 1996 WL 374186 (S.S.A. 1996); *Shramek v. Apfel*, 226 F.3d 809, 811(7th Cir. 2000). As discussed above, that is what the ALJ did in this case. The contrasts and inconsistences that the ALJ found appropriately informed her credibility analysis and her determination of Ms. Hamilton's RFC.

*Reynolds v. Bowen*, 844 F.2d 451, 454 (7th Cir. 1988). Because the ALJ properly and thoroughly grounded her analysis in the evidence of record, her conclusion is not patently wrong, is entitled to substantial deference, and should be upheld. *Jens v. Barnhart*, 347 F.2d 209, 213 (7th Cir. 2003); *Shramek*, 226 F.3d at 811; *Steward v. Bowen,* 858 F.2d 1295, 1302 (7th Cir. 1988); *Ray v. Bowen,* 843 F.2d 998, 1002 (7th Cir. 1988).

### C. THE ALJ GAVE SUFFICIENT WEIGHT TO CLAIMANT'S TREATING PHYSICIANS' OPINIONS

Next, Ms. Hamilton argues that the ALJ erred in rejecting the physical RFC assessments provided by her treating physicians, physiatrist Dr. Sheila Dugan and neurologist Dr. Martin Luken (Pl. Br. 12-14). A treating physician's opinion "regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by the medical findings and not inconsistent with other substantial evidence in the record." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir.2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir.2000)); 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.") However, an ALJ may properly discredit the opinion of a treating physician if it

is not supported by medical findings and is inconsistent with
other evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171,
1177 (7th Cir. 2001); 20 C.F.R. § 404.1527(d)(2). *See also*
*Luster v. Astrue*, 358 Fed. Appx. 738, 740 (7th Cir. 2010) ("This
court upholds all but the most patently erroneous reasons for
discounting a treating physician's assessment") (citing *Dixon*,
270 F.3d at 1177).

Regarding Dr. Sheila Dugan, the ALJ's decision stated that
she found Dr. Dugan's opinion to be generally consistent with
her own assessment of Ms. Hamilton's residual functional
capacity. [R. 42, *citing* R. 617-19] The only difference between
Dr. Dugan's opinion and that of the ALJ's RFC assessment is that
Dr. Dugan restricted Ms. Hamilton to occasional pushing and
pulling, and occasional overhead reaching, while the ALJ did not
include the limits on pushing and pulling, but found that Ms.
Hamilton could not engage in any overhead reaching with her left
upper extremity at all. [*compare* R. 617-19 *with* 36, 42-44] In
evaluating Ms. Hamilton's shoulder, the ALJ reasonably explained
that she gave great weight to the opinion of Dr. Sheldon Slodki,
the medical expert who testified at the administrative hearing,
and who had reviewed all the other medical opinions in the record
[R. 43] Dr. Slodki indicated that Ms. Hamilton had reaching
limitations with her left shoulder, but did not indicate that she
had restrictions in pushing and pulling [R. 79-80]

Dr. Luken's 2007 letter was the only opinion that the ALJ did not give any weight. In the letter, Dr. Luken stated that he considered Ms. Hamilton "completely disabled from the standpoint of gainful employment." [R. 647] The ALJ ruled that the letter was not a medical opinion, but an administrative finding that was reserved to the Commissioner, and for that reason not entitled to deference. [R. 42-43] The Court agrees. Additionally, Ms. Hamilton opines that the ALJ improperly rejected a 2009 opinion from Dr. Luken. However, as both the ALJ and Dr. Slodki noted, the 2009 opinion from Dr. Luken was actually written by physical therapist, Renee Spanburg, based on a one-time performance screen [R. 41-42, *citing* R. 623,635] Dr. Luken stamped his name on it and signed it, but added a note explaining, "current status unknown: have not seen since 8/24/07" [R. 41, 78, *citing* R. 660] Nonetheless, the ALJ found that Ms. Spanburg's assessment was otherwise generally consistent with her own determination of Ms. Hamilton's RFC, and gave it appropriate weight, albeit less weight than she gave to Dr. Slodki's opinion. [R. 43, 45-46]

The ALJ appropriately explained why she found the opinions from Dr. Dugan, Dr. Luken, Dr. Tioco, and Ms. Spanburg generally consistent with her own assessment of Ms. Hamilton's RFC, and she gave logical reasons for those aspects of the opinions that she did not accept. Accordingly, the ALJ did not patently reject the physical RFC assessments provided by Ms. Hamilton's treating physicians, but gave them sufficient weight as she saw fit based

on the evidence provided. Thus, her decision should be upheld. *Dixon*, 270 F.3d at 1177; *Luster*, 358 Fed. Appx. at 740.

### D. THE ALJ CONSIDERED THE ENTIRE RECORD

Lastly, Ms. Hamilton argues that the ALJ did not consider the entire record, in violation of 20 CFR §§404.1545(a) and 416.1945(a). [Pl. Br. 14] Ms. Hamilton opines that the ALJ ignored the actual evidence from the first hearing, the favorable evidence from the first hearing, and the favorable testimony of the VE. Conversely, the Court finds that the ALJ repeatedly stated that she considered all the evidence [R. 34, 35, 36, 37, 41, 45, 46], and her thorough discussion of the evidence, especially the additional evidence submitted pursuant to the Appeals Council's order, confirms this. Because the ALJ did not discuss every piece of evidence does not mean that she ignored it, as an ALJ "can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party," *NLRB v. Beverly Enterprises-Massachusetts*, 174 F.3d 13, 26 (1st Cir. 1999).

### CONCLUSION

For the reasons set forth above, Claimant's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted. The decision of the ALJ is affirmed.

Dated: July 26, 2012      ENTER:

*Arlander Keys*

ARLANDER KEYS
United States Magistrate Judge
7/26/2012